alleged debt, and knew or should have known they were violating Federal and State law by collecting a disputed debt prior to validation, verification and authentication.

73. Plaintiff filed an Objection to Defendant's extension for time on December 28, 2012, and a Default for not answering was filed with the Judge on January 14, 2013, again stating that this alleged debt is not Plaintiff's debt

74. The stress of not understanding why Defendant's kept pursuing this action without validation and knowing that the debt did not belong to Plaintiff put her husband in the hospital on January 16, 2013, not only for a heart attack but heart surgery, and exacerbated Plaintiff's disability and increase in medical treatment.

75. Defendant's Pidala and Hummel finally filed a Motion to Dismiss Plaintiff's Counterclaim on January 25, 2013 and attached to Defendant's Motion is JB Nutter's Notice of Default. Plaintiff also filed an Objection to this Motion (See their Notice of Default as **Exhibit I**).

76. Defendant's stated in their Motion to Dismiss Plaintiff's Counterclaim:

> *"On or about August 2, 2012, Plaintiff provided a Notice of Intent to Foreclose letter to Defendant informing him that he was in default of the terms of his Mortgage. The notice gave Defendant an opportunity to cure his default by remitting $3181.68 to Plaintiff within 30 days to pay the loan balance in full.  The notice also provided 30 days and listed all options available for which to cure his default. The notice further gave Defendant notice of his right to reinstate the mortgage*

22

*note and mortgage or deed of trust after acceleration and of the right to assert, in the instant foreclosure proceeding, the non-existence of a default or any other defense to acceleration and foreclosure. Defendant failed to respond according to said terms and as a result Plaintiff accelerated the amounts secured by the subject mortgage note and mortgage and commenced this foreclosure action.  A copy of said Notice of Breach is attached as Exhibit "A" ".*

BUT PLAINTIFF DID NOT RECEIVE THIS NOTICE OF DEFAULT.

77. This Notice of default letter dated August 2, 2012 was sent to the **WRONG** address and Plaintiff did not see it until it was attached to JB Nutter's Motion to Dismiss Plaintiff's Counterclaim, filed on January 25, 2013 in the lawsuit. (attached as **Exhibit I)**.

78. This same alleged notice was sent to the tenant in Florida and caused the tenant to break their lease and deprive Plaintiff of $1295.00/month from August of 2012 to this day.

79. Defendant left documents at Plaintiff's home in Georgia and continues to send the other collection letters to Plaintiff's home address, making it clear that they knew where Plaintiff lived.

80. To continue with collection of the alleged debt, Pidala filed a Notice of Hearing on February 1 for a Hearing on March 8, 2013 in Sarasota, FL.

81. Pidala stated that she had the original documents and could prove that JB Nutter was the right party to bring the lawsuit, so Plaintiff subpoenaed Attorney Pidala to bring the documents with her for the hearing.

23

82. Pidala and Jones filed a Motion to Quash the subpoena the day before the hearing, but to this day the subpoena was never quashed and there have been four different orders from Judges compelling them to produce these documents.

83. Since Plaintiff has a severe disability and it is very difficult for her to travel, she requested a telephonic hearing, which was denied.

84. Pidala did not bring the court ordered documents, as she did not appear in court, except telephonically without requesting permission from the court, when Plaintiff could not appear telephonically.

85. Sabrina Moravecky appeared in Pidala's place, on behalf of all defendants, for the March 8, 2013 hearing to sue Plaintiff for the alleged debt.

86. When Plaintiff asked Pidala to provide the contract that Plaintiff signed, and the law that allowed Pidala to collect on a deceased man's debt, Pidala admitted to the court that Plaintiff did not sign the Note and Mortgage.

87. Plaintiff had to drive from Atlanta, Ga for this hearing, spend money on gas, food, hotels, other expenses and the travel greatly affected her medical condition, and took months for Plaintiff to recover.

88. During the court proceeding Judge Williams agreed to everything

requested in the subpoena by Plaintiff (Defendant for the case), and signed the order by opposing counsel, treating it as production of documents on James B Nutter (subpoena attached as **Exhibit U**)

89. In Wolfe & Assocs. continued attempt to misrepresent what was happening in this case, Pidala and Moravecky wrote an order for the Judge to sign that *erroneously* stated what Judge Williams ordered, just happening to get their proposed order to the Judge hours before the Plaintiff's proposed order went in front of the Judge.

90. Pidala left out numerous documents that the Judge ordered Pidala to produce in court referencing the subpoena.

91. Plaintiff filed an Objection with an order that reflected what the Judge ordered during the hearing, along with an additional affidavit in support of the Judge's decision on March 8, 2013, but they were ignored. (affidavit attached as **Exhibit V**).

92. After driving to Sarasota on March 6 for the March 8, 2013 hearing, Plaintiff went to check on her property only to find that Safeguard properties had trespassed on her property and had placed abandoned stickers on the front door and windows and had gone in through the closed screen porch and put more abandoned stickers on the bedroom and family room patio doors.

93. Plaintiff contacted her property manager, Susie to bring the keys to

check the inside of the house, but Susie's keys did not work and her company did not change the locks after the last tenant left in September.

94. On March 8, 2013 Plaintiff called Safeguard Properties, REO Properties at 877-340-8482 about them defacing the house and changing the locks, but was told Plaintiff needed to talk to JB Nutter, because her name was not on the note and they could not give her any information.

95. Plaintiff made it clear that she was the owner of the property and requested that Safeguard have JB Nutter call her, which JB Nutter did within the hour and Plaintiff spoke to Jenny.

96. Jenny from JB Nutter stated that they gave no one authorization to change the locks and Safeguard was only to check the outside of the property.

97. Plaintiff also reassured JB Nutter that the property was not abandoned and she had a property manager and someone doing maintenance on the property and taking care of the pool.

98. Plaintiff was obviously upset and informed Jenny that Plaintiff had not authorized, licensed or allowed anyone to go on to Plaintiff's property other than the property manager and JB Nutter's deliberate negligent action was putting the property at risk, affecting the neighbor's safety because JB Nutter's agents were leaving the property vulnerable, and making a target out of the house.

99. Plaintiff mailed a letter to JB Nutter to Cease and desist and give Plaintiff her property back, explaining that Plaintiff was paying to maintain the property and pouring money into repairs and that JB Nutter's hiring of Safeguard Properties was creating more damage to the property, but Plaintiff received no response.

100. Because defendants were threatening foreclosure and Plaintiff was so far away, Plaintiff was still paying the property manager to maintain the outside of the property, but realtors would not rent or sell the property until the legal issues were resolved and we had access to the house.

101. Since March 8, 2013, when Plaintiff and her realtor were first made aware of JB Nutter's actions, thousands of dollars of damage has been done to the property due to the inability to get into the house

102. After research and contacting JB Nutter, Safeguard Properties, Code Enforcement & Building Officials, HUD, FHA, Sarasota Police and the Sarasota Sheriff about changing the locks, Plaintiff finally filed a police report, who verified that Plaintiff was the rightful owner and there were no legal actions taken against Plaintiff that would warrant any entity stealing her property. (police report attached as **Exhibit J** ).

103. On March 14, 2013 Denise Antonio of the Dvornick Law Group (a third party), hired by Wolfe & Assocs., contacted Plaintiff about her family's

location for the foreclosure, but this third party, Denise Antonio, *had all of Plaintiff's personal & family information* before she contacted her.

104. Plaintiff did not give any party authorization to contact her by phone and again on March 16, 2013 Denise Antonio contacted Plaintiff again for the same information.

105. In Plaintiff's request for validation of this alleged debt to Pidala, Plaintiff specifically requested that Wolfe & Assocs. only communicate in writing, so instead of Wolfe & Assocs. calling for the information, they hired a third party to contact Plaintiff for personal information, according to Attorney Denise Antonio.

106. On April 2, 2013 Defendants Marks, Phillips, Wulff and Tilka enter a notice dismissing a defendant from the lawsuit leaving Sherrie Hampton-Muhamed as the only person being sued for a non-existent debt.

107. On April 4, 2013, Plaintiff filed a second Notice of Default for Defendants not answering the Counterclaim, due on March 20, 2013, based on Defendants violation of Florida Rules of Civil Procedure 1.190(a), 1,190(b)(1), 1,110(b), 1.140(a)(3) and Fl. App. P 9.300.

108. On April 5, 2013 Tilka deceptively filed with the court that she had complied with the order from March 8, 2013 signed by Judge Williams to produce documents from the subpoena, but never mailed the Plaintiff any

documents other than a letter stating documents were attached, filed into the docket, dated April 4, 2013. (letter is Item #74 in the Docket)

109.   After Plaintiff notified Wolfe & Assocs. that she did not receive any of the documents, Tilka refiled exactly the same letter on April 22, 2013, again with no documents attached. (Item #84 in the docket),

110.   Plaintiff sent a second QWR, April 30, 2013 (certified mail # 7008 0150 0002 6978 3527) to Keith Ward at JB Nutter, which was received on May 2, 2013. (**Exhibit K**)

111.   Plaintiff received a response from Al Pitzner, dated May 8, 2013 in reference to the second QWR, stating that Plaintiff had no authorization to receive anything requested in the second QWR.

112.   Plaintiff spoke to Pitzner on the phone on or about May 13, 2013 in reference to the letter asking why he could not tell her who the real owner of the loan was and Pitzner eventually told her that he would never be able to name all of the investors, admitting that JB Nutter did not own the loan.

113.   Pitzner stated that JB Nutter would send whatever Plaintiff requested in the QWR, after realizing that Plaintiff was the executor of the estate.

114.   Not one document was sent to Plaintiff by JB Nutter and there was no further communication from JB Nutter or their attorneys in reference to

the QWR..

115. Since Plaintiff's first letter to Wolfe & Assocs. was ignored, a second debt validation letter (Certified Mail Return Receipt # 7008-0150-6978-3534), and a Copy sent to JB Nutter (Certified Mail Return Receipt # 7008-0150-0002-6978-3558) was sent to Pidala at Wolfe & Assocs. on April 30, 2013 and that letter too was ignored and no validation that Plaintiff owed this alleged debt was sent to her AGAIN.

116. Wolfe & Assocs. had every opportunity to address the dispute and have in essence agreed by ignoring this second letter, as stated below that since they did not validate the debt, they have waived all claims against Plaintiff:

> *"This is a second reminder that your failure to satisfy this request within the requirements of the Fair Debt Collection Practices Act will be construed as your absolute waiver of any and all claims against me, and your tacit agreement to compensate me for costs and legal fees."*
> (Copy of letter attached as **Exhibit L**)

117. In the continuation of collecting this alleged debt, Ugaz and Anthousis sent their response to Plaintiff's Counterclaim on May 9, 2013, after a complete disregard for Fla.R.Civ.P (noted above) by not filing anything into the case between March 20, 2013 (when response was due) and May 9.

118. Plaintiff's Notice of Default filed April 4, 2013 was still pending,

waiting for a hearing date, that Plaintiff had to schedule with the Judge.

119.  On May 13, 2013, Anthousis and Ugaz requested Production of Documents from Plaintiff in their effort to continue collecting this alleged non-existent debt, but Plaintiff did not receive the request until May 23, 2013.

120.  On May 28, 2013 Tilka and Ugaz filed Notice of Hearing for July 15, 2013 without discussing it with the Plaintiff first.

121. On June 14, 2013 Plaintiff filed a new Notice of Hearing.

122. Ugaz, Lewis and Schneider then cancelled that hearing on June 17, 2013.

123.  In an effort to try once more to resolve the issue of validating this debt with the Defendant's out of court, Plaintiff mailed a validation letter, certified, to both JB Nutter and Pidala of Wolfe & Assocs. on June 17, 2013 to get validation that they had any authority to come after Plaintiff for this alleged debt, but again absolutely no response (letters attached as **Exhibit M and N)**

124.  July 22, 2013 Plaintiff requested Interrogatories, Admissions & Production of Documents from James B Nutter & Co only.

125.  On August 2, 2013 Attorneys Ugaz, Lewis and Tilka responded to the Admissions with Objections that stated that **"James B Nutter had no personal information and that the information was not in their**

31

**possession, custody or control".**

126. JB Nutter has falsely alleged that they can enforce the note attached to this alleged debt, but do not have firsthand knowledge of any of the information.

127. On August 8, 2013 Attorneys Wulff, Ugaz and Lewis filed a Motion for Extension of Time to Respond to Interrogatories and Production of Documents.

128. On August 20, 2013 Judge Rapkin held another hearing, in which Defendant Hannon appeared, on behalf of all defendants, and claimed that he never received the Plaintiff's motions in front of the court for the hearing.

129. Plaintiff had documented proof to show that Hannon had received all of the motions and Hannon had actually sent copies back to Plaintiff before the hearing, but Judge Rapkin was only listening to Hannon's remarks and refused to allow Plaintiff to prove anything.

130. Judge Rapkin in support of counsel only addressed the one motion for Production of Documents related to the subpoena from February 27, 2013 and the rest of the motions were held over for a later hearing.

131. Judge Rapkin ordered Defendants from Wolfe & Assocs. to file the **<u>Original</u>** note and mortgage, ordered in the subpoena, to be filed into the court in 10 days (August 31, 2013), but Defendants did not file until

November 1, 2103.

132. Judge Rapkin gave the Defendants 30 days to produce the remaining documents from the subpoena, ordered by Judge Williams on March 8, 2013, but to this day Defendants have not produced them.

133. The items in the subpoena that were critical to everything in both cases are the same questions asked and never answered in the QWR's and debt dispute/validation letters, which were: 1) who owned the loan or who funded the loan for this note and mortgage(original creditor) and 2) who was looking to get paid now.

134. Also at the August 20, 2013 hearing Defendant, Hannon stated on and for the record that **Plaintiff did not have a contract with JB Nutter and owes JB Nutter no money**. (pages 8 & 9 of transcript attached as **Exhibit O**).

135. It wasn't until a ***portion*** of the subpoenaed documents were received on August 28, 2013 that Defendants admitted in writing that JB Nutter was only the servicer and the owners (not JB Nutter) were HUD/investors of this loan and HUD/investors are the ones that are looking to get paid now(letter attached as **Exhibit P)**

136. In preparation for trial, Lewis, Tilka and Ugaz filed their witness and exhibit list on September 6, 2013.

33

137. On September 25, 2013 Bruce Huey, VP at JB Nutter verified another amended complaint, obviously admitting that he **perjured** himself, since he also verified the first complaint and knew those facts were also *true and correct*. (second complaint as **Exhibit Q**)

138. Defendants could not prove that this alleged loan was in default or show how Plaintiff created a default.

139. Defendants did not comply with conditions precedent on either complaint, required by law in Florida, or comply with FDCPA, as stated as a fact on the complaint.

140. Huey of JB Nutter was attempting to collect on this nonexistent debt for the $91,263.16 along with any deficiencies.

141. On September 26, 2013 Anthousis, Lewis and Ugaz filed their first motion to strike the default, filed on April 4, 2013, for not filing an Answer to Plaintiff's Counterclaim.

142. On September 27, 2013 Matthew Wolf appeared in court, on behalf of all defendants, for another hearing, this time in front of Magistrate Toale and Plaintiff appeared telephonically.

143. October 1, 2013 Ivanov, Ugaz, Lewis and Anthousis responded to Plaintiff's Motion to Deem Admissions Admitted.

144. On October 2, 2013, in an effort to correct the mistakes made in the

first complaint, Tilka, Ugaz, Lewis and Anthousis filed a motion for leave to file an amended complaint almost a year after the first complaint.

145. Garno and Ugaz sent another notice for hearing on October 12, 2013 in front of Magistrate Bailey on October 24, 2013.

146. Amanda Croteau appeared at the October 24, 2013 hearing, on behalf of all defendants, which was held for 5 minutes with Magistrate Bailey in order to clarify that all future hearings would be held in front of a Judge instead of a Magistrate.

147. On November 1, 2013 Anthousis, Lewis and Ugaz sent Notice that they have filed the original Note and Mortgage into the court records.

148. Plaintiff filed this first FDCPA complaint against the Defendants on November 4, 2013 before Judge Bennett ordered to approve Defendant's amended complaint on December 6, 2013.

149. Plaintiff again drove from Atlanta to Sarasota for the December 6 hearing and examined the alleged original note and mortgage on December 5, 2013 in the court records.

150. After Plaintiff's examination of the Note and Mortgage, it was clear that these documents were NOT originals as implied by Defendants.

151. The documents were not certified or authenticated by someone with firsthand knowledge, as required by Florida Rules of Evidence.

152. Amanda Croteau appeared on December 6, 2013 for a hearing, on behalf of all defendants, with Judge Bennett for multiple motions from Plaintiff and Defendants Motion to Amend their Complaint and Plaintiffs Objection to their amended complaint.

153. These multiple motions were addressed at the hearing to include Judge Bennett's oral order to allow JB Nutter to amend their complaint and orders that compelled JB Nutter to produce all court ordered documents by December 26, 2013.

154. After the hearing, Plaintiff went to her property to find that Safeguard had put more abandoned stickers on the house and everything in the house was gone and again the locks had been changed.

155. Since blinds had been removed Plaintiff could see through the whole house finding everything was gone (appliances, yard tools, blinds, etc.) and there was damage to the wood floors, walls and ceiling.

156. The damage and stolen goods would estimate around $10,000 to replace and repair.

157. Plaintiff had notified Safeguard Properties and JB Nutter in March of 2013 that she, the owner, did not give either party authorization to enter her property, deface it, destroy it or take over control of the property.

158. Defendants admitted that they contacted Safeguard in reference to

this property and Plaintiff is well aware that Safeguard has been on her property, but Safeguard and defendants refused to address the damage being done or the fact that the locks had been changed without any authorization from the property owner.

159. Defendant's actions have left the property vulnerable to the neighborhood, labeling the house abandoned, when it is only empty at the moment, allowing the criminal activity to take place.

160. Ivanov, Ugaz and Lewis produced objections to providing the court ordered production of documents from Discovery to Plaintiff and filed it on December 12, 2013.

161. Defendants have failed to produce any information through discovery or otherwise that would prove that JB Nutter has the right to bring any action against this Plaintiff.

162. To this day, Croteau did not comply with specific instructions and coaching from Judge Bennett to provide the court ordered documents from the February 28, 2013 subpoena and the multiple orders from different Judges to Compel them to produce.

163. Croteau requested she write all of the orders from the December 6, 2013 hearing, but Plaintiff did not receive copies of these proposed orders until January 5, 2014, the day her response was due.

37

164. Plaintiff was given 5 days by Judge Bennett to object if any of the orders were erroneous.

165. Plaintiff filed her objections with her own set of proposed orders on January 9, 2014, as Defendant's orders were a direct misrepresentation of the Judge orders, evidenced by the transcript in the court docket. (Item# 165)

166. Plaintiff filed a Motion to Dismiss in response to the amended complaint on January 5, 2014, while awaiting orders from the Judge.

167. At the same time Plaintiff received an affidavit from a certified securitization analyst, proving that JB Nutter provided no consideration for this loan, suffered no financial loss and was collecting the debt on behalf of a Ginnie Mae Trust REMIC 2003-099.

168. On January 10, 2014, Defendants filed a proposed Summons to serve the Amended complaint but the court could not release the summons, since there were no orders from the Judge for the amended complaint.

169. When the Judge did not sign any orders, Plaintiff amended her Motion to Dismiss their amended complaint on February 3, 2014.

170. Lewis, Tilka and Ugaz filed their response to Plaintiff's Motion to Dismiss on February 17, 2014.

171. Matthew Marks filed an Affidavit into the record on February 18, 2014 for service of unknown parties by publication (including tenants), after

JB Nutter hired Safeguard to put abandoned stickers on the house.

172. Defendants have continued to charge fees to serve tenants that don't exist, charge fees that are not agreed to in any contract and continue to collect on an alleged debt that does not belong to Plaintiff that was never validated or authenticated before pursuing debt collection.

173. Defendants have failed to correct the erroneous presumption that Sherrie Hampton-Muhamed executed the Note and Mortgage or owes JB Nutter any money.

174. JB Nutter is not the real party entitled to enforce the alleged debt. JB Nutter has never been damaged in any way by the Plaintiff or any other entity, as evidenced by 1)their statement of collecting money on behalf of the owner, which is HUD/investors and 2) the affidavit that proves that the loan is in a trust.

175. There are currently 190 + line items on the docket with the involvement of at least 16 named attorneys from Wolfe & Assocs. that have filed pleadings, motions, notices, have been to hearings or done something with this case on behalf of JB Nutter that shows misrepresentation, deceit, bad faith and harassment.

176. The Defendants have spent the last eighteen months proving their intentional, willful and negligent violations.

177. Plaintiff has made every effort to resolve all of the issues related to Defendants attempts to collect this deceased man's debt out of court, but with no cooperation.

178. Defendants continue to attempt to collect this alleged debt without any validation, without verifying the true creditor and now have allowed everything to be taken from Plaintiff's property.

179. Plaintiff contends that the illegal actions of the Defendants, coming with unclean hands, have harmed the Plaintiff, resulting in a reduction of her ability to function, medical costs, mental anguish, loss of income, damages to her property, theft of her property and completely unnecessary expenditures for legal fees and costs.

## COUNT I

**VIOLATION OF THE FAIR DEBT COLLECTIONS PRACTICES ACT (FDCPA) 15 U.S.C.§ 1692 et seq. BY ALL DEFENDANT DEBT COLLECTORS (All Defendants except as specified in factual allegations)**

180.  Plaintiff repeats that Paragraphs 1 through 179 are alleged as though fully set forth herein.

181. Plaintiff is a consumer within the meaning of the FDCPA, 15 U.S.C., §1692a(3)  as the term "consumer" means "any natural person obligated or allegedly obligated to pay any debt."

182. Plaintiff is a consumer for purposes of § 1692c(d) (communication in connection with a debt), the term "consumer" includes the "consumer's spouse, parent (if the consumer is a minor), guardian, executor, or administrator", as Plaintiff was executor of the estate.

183. Plaintiff is a consumer for purposes of 1692d because this alleged debt does not belong to Plaintiff.  A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse consumer, which occurred when suing Plaintiff for a dead man's debt.

184. Ronald R. Wolfe & Assocs. with all named and unnamed attorneys, allegedly hired by JB Nutter to collect the alleged debt are debt collectors as defined by 1692a(6) and have admitted in all communications that "**Ronald R Wolfe & Associates, P.L. is a debt collector. This Firm is attempting to collect a debt, and information obtained may be used for the purpose**".

185. Defendant JB Nutter, et al along with all employees named and unnamed, is a debt collector within the meaning of the FDCPA, 15U.S.C. §1692a (6) and 15U.S.C. §1692 f (6) reminding the court that this entity is a servicer who continually collect payments for other entities and are third party interlopers attempting to collect a debt from the wrong person.

186.   JB Nutter fits the term "debt collector" per 15 USC § 1692a(6) meaning any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of  who regularly collects or attempts to collect, directly or indirectly, debts owed or due, or asserted to be owed or due another.  The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. . . . For the purpose of section 1692f(6) of this title, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests. . . .

187.   JB Nutter is a foreign corporation that is not a bank, did not lend any money for this alleged loan and cannot originate loans in Florida and is not a creditor.

188.   JB Nutter attempted to collect on this alleged debt after they sold, transferred or assigned the loan and the loan went into default.

189.   JB Nutter has admitted that they are a servicer only and are collecting debts on behalf of others, and on *this* alleged loan are collecting for HUD/investors, so JB Nutter can be nothing other than a third party debt

42